UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel:
SNAPP, Inc., f/k/a Dearborn
Systems Services, Inc.,

    Plaintiff,

v.                                                                                          Case No. 06-11848

FORD MOTOR COMPANY,                                        HONORABLE AVERN COHN

    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS
## FIRST AMENDED QUI TAM COMPLAINT

I.  Introduction

This is a qui tam action brought by SNAPP, Inc. (SNAPP) against Ford Motor Company (Ford) generally claiming that Ford made false claims or statements to the government beginning in 1991 and continuing through 1999, in violation of the False Claims Act, 31 U.S.C. § 3729 (FCA).  Ford filed a motion to dismiss in part on the grounds that SNAPP failed to meet the pleading requirements of Fed. R. Civ. P. 9(b). The Court granted in part and denied in part the motion and directed SNAPP to file an amended complaint to cure certain pleading deficiencies.  See Order Granting in Part Ford's Motion to Dismiss and Directing SNAPP to file an Amended Complaint within Twenty (20) Days, filed September 7, 2006.

Before the Court is Ford's second motion to dismiss on the grounds that the allegations in SNAPP's First Amended Qui Tam Complaint still fails to satisfy Rule 9(b).

For the reasons that follow, the motion is GRANTED. This case is DISMISSED.

II. Background

Much of the background is taken from the September 7, 2006 Order.

On April 30, 2003, SNAPP filed a qui tam complaint in the Southern District of Ohio[1] against Ford claiming violations of the FCA. Broadly stated, SNAPP claims that Ford violated the FCA when it submitted information to the government regarding the amount of good and services Ford purchased from minority owned businesses, specifically SNAPP. SNAPP alleges that it was not a minority owned business because during the relevant time (1991-1999) SNAPP was controlled by Ford and the parties were involved in a partnership, not a supplier/purchaser relationship.

On July 19, 2004, the government notified the district court that it declined to intervene and the district court unsealed the complaint and ordered that it be served on Ford. Over the next year and a half, the district court issued two more orders directing SNAPP to serve Ford with the complaint or explain its failure to prosecute. Finally, on January 26, 2006, the district court issued a fourth order to show case as to why service could not be obtained. On February 10, 2006, SNAPP finally served Ford with the complaint.[2]

On March 2, 2006, Ford filed a motion to dismiss on the grounds of failure of

---

[1] It is not clear why SNAPP filed in the Southern District of Ohio. Although the complaint says that venue is appropriate in the Southern District of Ohio because "Ford, during the relevant periods, resided, transacted business, and can be found in" the district, Ford is a Delaware corporation with its principle place of business in Dearborn, Michigan, located in this district. Moreover, SNAPP is a Delaware corporation "with offices... in Beaumont, Texas."

[2] The delay in serving Ford is not explained.

2

SNAPP to timely serve Ford.  On April 14, 2006, the parties stipulated to a transfer of the case to this district.  The case was received and docketed as case no. 06-11848 and assigned to another judge on April 19, 2006.  Thereafter, on June 9, 2006, the case was reassigned to the Court as a companion to case no. 03-74357, SNAPP v. Ford.  At the time of the reassignment, Ford had already filed its first motion to dismiss and motion to consolidate.

Following the Court's September 7, 2006 Order, SNAPP filed an amended complaint.  Ford then filed the instant motion.

### III.  Motion to Dismiss

#### A.  Legal Standard

A Fed. R. Civ. P. 12(b)(6) motion seeks dismissal for a plaintiff's failure to state a claim upon which relief can be granted.  "The court must construe the complaint in the light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff can prove a set of facts in support of its claims that would entitle it to relief."  Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001).  "To survive a motion to dismiss under Rule 12(b)(6), a 'complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory.'"  Advocacy Org. for Patients & Providers v. Auto Club Ins. Ass'n., 176 F.3d 315, 319 (6th Cir. 1999) (quoting Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 436 (6th Cir. 1988)).

While Fed. R. Civ. P. 8 calls for a "short and plain statement" of a claim, Fed. R. Civ. P. 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."  A fraud claim should

3

specify the following details:

> the parties and the participants to the alleged fraud, the representations made, the nature in which the statements are alleged to be misleading or false, the time, place and content of the representations, the fraudulent scheme, the fraudulent intent of the defendants, reliance on the fraud, and the injury resulting from the fraud.

Id.; see also Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir. 1993).

When deciding a motion to dismiss under Rule 9(b) for failure to plead fraud with particularity, a court must also consider the policy favoring simplicity in pleading, codified in the "short and plain statement of the claim" requirement of Federal Rule of Civil Procedure 8. "Rule 9(b)'s particularity requirement does not mute the general principles set out in Rule 8; rather, the two rules must be read in harmony." Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988). On the other hand, a district court need not accept claims that consist of no more than mere assertions and unsupported or unsupportable conclusions. Kottmyer v. Maas, 436 F.3d 684, 688 (6th Cir. 2006).

## B. The False Claims Act

The FCA creates liability for any person who "(1) knowingly presents, or causes to be presented, to [the Government] ⋯ a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a) (2006). Qui tam provisions of the FCA serve the two-fold purpose of encouraging whistle blowers to act as private attorneys-general in bringing suits for the common good, while simultaneously seeking to discourage opportunistic

4

plaintiffs from bringing parasitic lawsuits whereby would-be relators merely feed off a previous disclosure of fraud. Walburn v. Lockheed Martin Corp., 431 F.3d 966, 970 (6th Cir. 2005).

B.  Analysis

1.  The Court's September 7, 2006 Ruling

The Court identified several deficiencies in the qui tam complaint, as follows:

- SNAPP must do more than recite conclusory allegations of Ford's allegedly fraudulent billing practices leading to "payments" by the government which it would not otherwise have made.

- The complaint contains no allegations as to which claims submitted by Ford would not have been paid or which payments it would not have made.

- SNAPP has not identified any government contract that Ford allegedly received as a result of being qualified as a "Prime Contractor" or a single payment made by the government to Ford because of its "Prime Contractor" status.

2.  Parties' Arguments

Ford says that SNAPP's amended complaint suffers from the same deficiencies. That is, it does not reference a single claim submitted by Ford to the government or any payments made by the government to Ford on account of a particular government contract which can be tied to Ford's allegedly false minority subcontracting reports.

SNAPP says the amended complaint has cured the deficiencies. A review of the amended complaint displays the following allegations. SNAPP identifies Ford's Minority

5

Subcontracting Reports and the related SF 295 forms, in which Ford represents that it contracts with minority businesses, as the apparent "claims" which Ford allegedly falsely submitted to the government.  SNAPP details the date on which each subcontracting report was submitted to the government, the amount of Ford's subcontracting goal for each year stated, and the identity of the person who signed each subcontracting report.  SNAPP also adds allegations as to why it believes the subcontracting reports were false, i.e. that because SNAPP was controlled by Ford, Ford effectively did not contract with minority businesses in the amount represented.

### 3.  The First Amended Qui Tam Complaint

The nub of the First Amended Qui Tam Complaint is summarized in SNAPP's papers as follows:

> ...Ford committed the fraudulent activity by signing fraudulent Subcontracting Plan that were a condition precedent to acquiring a contract by the government and by signing SF-295 Form that were requirements pursuant to the contracts.  The documents were fraudulent because the dollar amounts stated in the documents reflected payments that were planned to be or actually made to SNAPP, which did not qualify as a Small Disadvantages Business after 1995 within the meaning of 15 U.S.C. § 637(d) and because Ford exercised control over SNAPP.

SNAPP's response brief at p. 6, citing First Amended Qui Tam Complaint at § 56-62.

### 4.  Conclusion

Ford says that the subcontracting forms referenced by SNAPP do not constitute "claims" within the meaning of the FCA.  The Court agrees.  A "claim" under the FCA is a "request for payment."  See U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 F.3d 1301, 1311 (11th Cir. 2002).  The FCA defines a "claim" as "any request or demand, whether under a contract or otherwise, for money or property."  31 U.S.C. §

3729(c).

SNAPP, however, says that the allegedly false subcontracting reports are sufficient to state a claim under the FCA because "it merely has to show that Ford engaged in fraudulent conduct with the purpose of inducing payment from the government."  SNAPP's response at p. 4.  In support, <u>SNAPP cites U.S. ex rel. Pogue v. American Healthcorp., Inc.</u>, 914 F. Supp. 1507, 1513 (M.D. Tenn. 1996).  In <u>Pogue</u>, the plaintiff alleged that the defendants violated the FCA by being were involved in a scheme by which individual physicians would refer their Medicare and Medicaid patients to the defendant for treatment, in violation of federal anti-kickback and self-referral statutes, such as the Medicare Fraud & Abuse Statute.  The "claims" submitted were Medicare request for reimbursement forms.  The claims themselves were not false as they were for services actually rendered; however, plaintiff alleged that the FCA was still violated because by submitting these claims, defendants implicitly stated that they had complied with all statutes, rules, and regulations governing the Medicare Act, including federal anti-kickback and self-referral statutes.  The district court, on reconsideration, held that plaintiff stated a claim essentially because plaintiff alleged a scheme by which the defendants engaged in fraudulent conduct in order to obtain a payment from the government.  Pogue is distinguishable because there the defendants made "claims" for payment in the form of reimbursement requests.  The court did not hold that a plaintiff need not make a claim, but rather simply show fraudulent conduct intended to induce payment.  Whether or not the defendants submitted a "claim" was not an issue.  What was an issue was whether the "claim," valid on its face was nonetheless in violation of the FCA because it was the product of fraudulent conduct. Here, SNAPP has not

7

identified any "claims" made to the government nor has it provided any authority for finding that the subcontracting reports are "claims" under the FCA.

Moreover, SNAPP's reliance on U.S. v. Sollinger, ___ F. Supp. 2d ___, 2006 WL 29227509 (W.D. Ky. 2006) for the proposition that asserting allegations of Ford's allegedly fraudulent subcontracting reports is sufficient to state a claim under the FCA is misplaced. In Sollinger, the relator, like the relator in Pogue, alleged a violation of the FCA through a violation of the Medicare anti-kickback laws. The "claim" was in the form of cost certifications to Medicare and Medicaid that asserted compliance with these laws. Put simply, cases involving a violation of the FCA in the context of violations of Medicare and Medicaid laws are not analogous to the conduct alleged here. This is particularly so because the submission of the subcontracting forms do not entitle Ford to anything other than the ability to bid on future government contracts.

Here, however, SNAPP attempts to blur the distinction between fraudulent billing practices (such as those at issue in the cases discussed above) and Ford's submission of subcontracting reports in an attempt to transform the latter into a "claim" under the FCA.
The identification of a "claim" is still lacking. Moreover, SNAPP does not provide any information regarding Ford's request for payment from the government, but rather identified only alleged total annual payments made by the government to Ford for the purchase/sale of vehicles.

In a supplemental paper, to which Ford responded, SNAPP argues that a recent decision from the Sixth Circuit impacts Ford's argument as to whether SNAPP has alleged a "claim" under the FCA. SNAPP cites U.S. ex rel. Thacker v. Allison Engine

8

Co., Inc., 471 F.3d 610 (6th Cir. 2006). In Thacker, the Sixth Circuit held that the not all sections of the FCA require presentment of a claim to the government, but rather "[s]o long as it can be shown that the government paid out money in response to a claim, no evidence is needed under this test that a claim was presented to the government." 471 F.3d at 619. Thacker, however, did not address the issue of what constitutes a "claim." SNAPP has still failed to show that the subcontracting reports amount to a claim under the FCA or how the government paid out money in response to the subcontracting reports.

Moreover, like the original qui tam complaint, the amended complaint does not identify any government contract that Ford allegedly received as a result of being qualified as a "Prime Contractor" or a single payment made by the government to Ford because of its "Prime Contractor" status. Rather, SNAPP cursorily alleges that "[f]rom 1991 through at least 2001, Ford was awarded contracts on an annual basis by the [GSA]." First Amended Quit Tam Complaint at ¶ 23. SNAPP only alleges that Ford filed subcontracting reports and the government paid Ford for the purchase of vehicles. SNAPP does not plead any link between the two. SNAPP has not identified any contract that Ford was allegedly wrongfully awarded as a result of being a Prime Contractor. In short, SNAPP has not properly alleged a violation of the FCA.

SO ORDERED.

Dated: February 01, 2007  
                                          s/Avern Cohn  
                                          AVERN COHN  
                                          UNITED STATES DISTRICT JUDGE

I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, February 1, 2007, by electronic and/or ordinary mail.

                                                        s/Julie Owens  
                                                      Case Manager, (313) 234-5160