UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA, ex rel.
SNAPP, Inc., f/k/a Dearborn
Systems Services, Inc.,

    Plaintiff,

v.                                                    Case No. 06-11848

FORD MOTOR COMPANY,           HONORABLE AVERN COHN

    Defendant.

_____/

## MEMORANDUM AND ORDER ON REMAND

### I. Introduction

This is a qui tam action brought by relator, SNAPP, Inc. (SNAPP), against Ford Motor Company (Ford) generally claiming that Ford made false claims to the government beginning in 1991 and continuing through 1999, in violation of the False Claims Act, 31 U.S.C. § 3729 (FCA). The matter is on remand from the Court of Appeals for the Sixth Circuit. See United States ex rel. SNAPP, Inc. v. Ford Motor Co., 532 F.3d 496 (6th Cir. 2008) (U.S. ex rel. SNAPP). As will be explained, the Sixth Circuit remanded the case for consideration of its decision in United States ex rel. Bledsoe v. Cmty. Health Sys., Inc., 501 F.3d 493 (6th Cir. 2007) (Bledsoe II). Bledsoe II was decided after the Court granted Ford's motion to dismiss and denied SNAPP's motion for leave to file a Second Amended Complaint (SAC). Specifically, the Court is to decide whether to set aside its decision denying SNAPP's motion to file the SAC in light

of <u>Bledsoe II</u>. The Court directed the parties to file papers regarding this issue. The papers have been received, the Court heard oral argument, and the matter is now ready for decision. For the reasons that follow, the Court again concludes that the SAC fails to satisfy the pleading requirements under Fed. R. Civ. P. 9(b) for a claim under the FCA. Specifically, the SAC, like the prior pleadings, fails to plead a specific false "claim" under the FCA. The case will be dismissed.

## II. Background

On April 30, 2003, SNAPP filed a qui tam complaint in the Southern District of Ohio[1] against Ford claiming violations of the FCA. Broadly stated, SNAPP claims that Ford violated the FCA when it submitted information to the government regarding the amount of good and services Ford purchased from minority owned businesses, including SNAPP. SNAPP alleges that it was not a minority owned business because during the relevant time (1991-1999) SNAPP was controlled by Ford and the parties were involved in a partnership, not a supplier/purchaser relationship and that SNAPP had too many employees. In <u>U.S. ex rel. SNAPP</u>, the Sixth Circuit accurately summarized SNAPP's allegations as follows:

> Relator alleges that, from 1991 until 1999, Ford fraudulently exaggerated the extent of its dealings with small and minority-owned businesses, and that these exaggerations induced the federal government to contract with Ford, even though Ford never implemented a plan to "provide[ ] the maximum practicable opportunity" to such businesses. According to Relator, during this eight-year

---

[1] It is not clear why SNAPP filed in the Southern District of Ohio. Although the complaint says that venue is appropriate in the Southern District of Ohio because "Ford, during the relevant periods, resided, transacted business, and can be found in" the district, Ford is a Delaware corporation with its principle place of business in Dearborn, Michigan, located in this district. Moreover, SNAPP is a Delaware corporation "with offices... in Beaumont, Texas."

2

> period Relator was controlled entirely by Ford. Ford nominated the majority of Relator's board members, its organization charts included Relator and its employees, and Ford had full control over its dealings with Relator. Though Relator was nominally owned and managed by a person of color, Relator maintains that this nominal control was a sham, and that Relator actually operated as a subdivision of the Ford Motor Company. Moreover, Relator claims, even if it did qualify as a minority-owned business during its dealings with Ford, from 1995 until 1999, Relator had too many employees to qualify as a small business.
>
> Despite Relator's claims that it functioned entirely as a subdivision of Ford, Ford filed official reports with the government stating that, between 1991 and 1998, Ford made significant improvements in the amount of business it subcontracted to small and minority-owned businesses. As a prime government contractor, Ford was required to file yearly reports documenting what percentage of the subcontracts related to its government contracts were made with small or minority-owned businesses. . . .
>
> The crux of Relator's complaint is that, despite Ford's reports claiming that it had enacted and was successfully implementing a plan to "provide[ ] the maximum practicable opportunity" to small and minority-owned businesses, Ford had inflated the extent of its dealings with such businesses by fraudulently declaring money paid to Relator as a subcontract with a small and minority-owned business. According to Relator, "the Relator was being used by Ford as a conduit for the satisfaction of Ford's, not the Relator's, obligations to Ford's majority suppliers of goods and services to Ford." (J.A. 245) Ford, Relator claims, would subcontract with a large, majority-owned business; Ford would then launder its payments to that large, majority-owned business through Relator. Under this scheme, Relator would receive those payments only for the purpose of passing them through to the large, majority-owned subcontractor, but Ford would still report these transactions to the government as a subcontract with a small, minority-owned business.

U.S. ex rel. SNAPP, 532 F.3d at 500.

On July 19, 2004, the government notified the district court that it declined to intervene and the district court unsealed the complaint and ordered that it be served on Ford. Over the next year and a half, the district court issued two more orders directing SNAPP to serve Ford with the complaint or explain its failure to prosecute. Finally, on January 26, 2006, the district court issued a fourth order to show case as to why service could not be obtained. On February 10, 2006, SNAPP finally served Ford with the

3

complaint.[2]

On March 2, 2006, Ford filed a motion to dismiss on the grounds the SNAPP had failed to timely serve the complaint. On April 14, 2006, the parties stipulated to a transfer of the case to this district. The case was received and docketed as case no. 06-11848 and assigned to another judge on April 19, 2006. On May 22, 2006, Ford filed a motion to dismiss under Fed. R. Civ. P. 12(b)(6) and 9(b) asserting that the complaint failed to plead a claim under § 3726 with the required specificity and that many of the claims were time barred y the applicable six year statute of limitations.

Thereafter, on June 9, 2006, the case was reassigned to the Court as a companion to case no. 03-74357, SNAPP v. Ford.

On September 7, 2006, the Court granted Ford's motion to dismiss and dismissed any claims which predated April 30, 1997 as barred by the statute of limitations. The Court also granted SNAPP leave to amend to cure a fatal deficiency in the complaint – the failure to specifically plead the government's payment of false claims made by Ford.

On October 4, 2006, SNAPP filed a First Amended Complaint (FAC). Ford filed a second motion to dismiss on the grounds that the FAC failed to comply with Fed. R. Civ. P. 9(b) by failing to plead the making of a false "claim" under § 3729 with required specificity. The Court agreed and dismissed the FAC. See Order dated February 1, 2007. Thereafter, SNAPP filed a motion for leave to amend together with a proposed Second Amended Complaint (SAC) which contained attachments SNAPP said

---

[2]The delay in serving Ford has not been explained.

4

constituted new evidence. The new evidence was a listing of the sixty five (65) contracts Ford had with the government from 1991 to 1999, the value of each contract value, and the number of vehicles sold under each contract. The Court denied the motion, holding that the allegedly "new" evidence in the SAC was not new and had already been submitted to the Court. See Order filed March 16, 2007. The Court also noted that it had previously found that the contracts SNAPP referenced are not claims within the meaning of the FCA. The Court entered a judgment of dismissal on the same day.

SNAPP appealed. The Sixth Circuit affirmed the dismissal of the FAC but remanded the matter for consideration of whether to vacate the March 16, 2007 judgment and grant SNAPP's motion for leave to file a SAC in light of the decision in Bledsoe II.

III. Legal Standards

A. Motion to Alter or Amend

The Sixth Circuit's decision requires the Court to consider whether to vacate the judgment of dismissal. This implicates Fed. R. Civ. P. 59(e). Motions to alter or amend judgments under Rule 59(e), are "entrusted to the court's sound discretion." Keweenaw Bay Indian Community v. United States, 940 F.Supp. 1139, 1140 (W.D. Mich. 1996) (citing Huff v. Metropolitan Life Ins. Co., 675 F.2d 119, 122 (6th Cir. 1982)). Rule 59(e) motions are generally granted when one of the following circumstances arises: (1) because of an intervening change in the controlling law; (2) because evidence not previously available has become available; or (3) necessity to correct a clear error of law or prevent manifest injustice. Nagle Industries, Inc. v. Ford Motor Co., 175 F.R.D.

5

251, 254 (E.D. Mich. 1997) (citing Keweenaw Bay, 940 F. Supp. at 1141).

B.  Instructions on Remand

The Sixth Circuit gave two instructions to the Court on remand.  In the first instruction, the Sixth Circuit set forth the rule of law which the Court should follow in determining whether the SAC passes muster:

> On remand, the district court should consider whether the following rule, which we articulated in Bledsoe II, justifies setting aside its prior judgment and allowing Relator to amend its complaint:
>
>> We conclude that the concept of a false or fraudulent scheme should be construed as narrowly as is necessary to protect the policies promoted by Rule 9(b).  Specifically, we hold that the examples that a relator provides will support more generalized allegations of fraud only to the extent that the relator's examples are representative samples of the broader class of claims.  In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be "characteristic example[s]" that are "illustrative of [the] class" of all claims covered by the fraudulent scheme.  The examples of false claims pled with specificity should, in all material respects, including general time frame, substantive content, and relation to the allegedly fraudulent scheme, be such that a materially similar set of claims could have been produced with a reasonable probability by a random draw from the total pool of all claims.  With this condition satisfied, the defendant will, in all likelihood, be able to infer with reasonable accuracy the precise claims at issue by examining the relator's representative samples, thereby striking an appropriate balance between affording the defendant the protections that Rule 9(b) was intended to provide and allowing relators to pursue complex and far-reaching fraudulent schemes without being subjected to onerous pleading requirements.

U.S. ex rel. SNAPP, 532 F.3d at 508 (quoting Bledsoe II, 501 F.3d at 510-11).

The Sixth Circuit also noted that the Supreme Court weighed in on the issue after its decision in Bledsoe II, which the Court is also to consider:

> Finally, we acknowledge that, in light of the Supreme Court's recent decision in Allison Engine Co. v. United States ex rel. Sanders, the law in this Circuit is now less friendly to qui tam plaintiffs than it was prior to that decision.  In Sanders, the Supreme Court held that a qui tam plaintiff may only prevail upon a showing that

6

the defendant made a false statement with the purpose of "getting a false or fraudulent claim 'paid or approved by the Government.' " 128 S.Ct. at 2128, 2008 WL 2329722, at *5 (quoting § 3729(a)(2)). Because Rule 9(b) exempts allegations of "malice, intent, knowledge, and other conditions of a person's mind" from its heightened pleading requirement, it is not necessary, at least at this early stage of the litigation, for Relator to allege with particularity facts showing that Ford acted with a particular purpose. Fed.R.Civ.P. 9(b). Nevertheless, because the district court has not had the opportunity to consider Relator's proposed Second Amended Complaint in light of Sanders, it would also be inappropriate for us to impose our view of whether Sanders prevents Relator from filing his Second Amended Complaint when the district court has not had the opportunity to consider this question in the first instance. See Bledsoe II, 501 F.3d at 521 n. 22; Nash, 437 F.3d at 526 n. 10. Accordingly, we will allow the district court to consider this issue on remand.

Id. at 509.

The second instruction pertains to the overall purpose of Rule 59(e):

In reconsidering Relator's motion in light of Bledsoe II, the "governing principle" guiding the district court's consideration should be whether vacating its order dismissing Relator's complaint, and allowing the amended complaint, "is required in order to prevent an injustice; and where an injustice will otherwise result, the trial judge has the duty as well as the power to order a new trial." Davis by Davis v. Jellico Community Hospital, Inc., 912 F.2d 129, 133 (1990).

Id. at 508-9.

### C. Pleading Requirements

There is no dispute that SNAPP's claim under the FCA is subject to the pleading requirements of Fed. R. Civ. P. 9(b). Rule 9(b) requires that parties "alleging fraud ... must state with particularity the circumstances constituting fraud." To satisfy Rule 9(b), a complaint of fraud, "at a minimum, must 'allege the time, place, and content of the alleged misrepresentation on which [the plaintiff] relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.' " United States ex rel. Bledsoe v. Cmty. Health Sys., Inc. (Bledsoe I), 342 F.3d 634, 643 (6th Cir.2003) (quoting Coffey v. Foamex L.P., 2 F.3d 157, 161-62 (6th Cir.1993) (internal

7

quotation marks and citations omitted)).

There are several purposes for this heightened pleading requirement. Claims of fraud "raise a high risk of abusive litigation." See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1973 n. 14 (2007); see also Bledsoe II, 501 F.3d at 510 (noting that Rule 9(b) is meant to protect defendants from "fishing expeditions and strike suits"); United States ex rel. Atkins v. McInteer, 470 F.3d 1350, 1360 (11th Cir. 2006) ("Rule 9(b) ensures that the relator's strong financial incentive to bring an FCA claim-the possibility of recovering between fifteen and thirty percent of a treble damages award-does not precipitate the filing of frivolous suits."). Rule 9(b) is also meant to protect defendants from " 'spurious charges of immoral and fraudulent behavior.' " Bledsoe II, 501 F.3d at 510 (quoting Sanderson v. HCA-The Healthcare Co., 447 F.3d 873, 877 (6th Cir. 2006)); accord United States ex rel. Fowler v. Caremark RX, L.L.C., 496 F.3d 730, 740 (7th Cir. 2007) (" 'Greater precomplaint investigation is warranted in fraud cases because public charges of fraud can do great harm to the reputation of a business firm or other enterprise (or individual)).' " (quoting Ackerman v. Nw. Mut. Life Ins. Co., 172 F.3d 467, 469 (7th Cir. 1999) (citations omitted)). Lastly, Rule 9(b) is intended to provide defendants with "notice of the specific conduct with which they were charged," so that the defendants can prepare responsive pleadings. Bledsoe II, 501 F.3d at 510.

## IV. Analysis

### A.

The FCA creates liability for any person who "(1) knowingly presents, or causes to be presented, to [the Government] ⋯ a false or fraudulent claim for payment or

approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; [or] (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid." 31 U.S.C. § 3729(a) (2006). Although SNAPP originally claimed violations of § 3729(a)(1) and (a)(2), it now says it is pleading only violations of § 3729(a)(2). See SNAPP's reply brief, n.1. Thus, it is not necessary to address the parties' arguments relating to section (a)(1).

In U.S. ex rel. SNAPP, the Sixth Circuit articulated the elements of a section (a)(2) claim as follows:

> First, the defendant must have made a false statement or created a false record, and must have done so "with 'actual knowledge,' 'deliberate ignorance,' or 'reckless disregard of the truth or falsity of the information.' " United States ex rel. Augustine v. Century Health Services, 289 F.3d 409, 413 (6th Cir.2002).
>
> **Second, the defendant must have submitted a claim for payment to the federal government**. See United States ex rel. Marlar v. BWXT Y-12, L.L.C., 525 F.3d 439, 447 (6th Cir.2008).
>
> Third, the defendant's false statement must have been made with the purpose of "getting a false or fraudulent claim 'paid or approved by the Government.' " Allison Engine Co., Inc. v. United States ex rel. Sanders, --- U.S. ----, 128 S.Ct. 2123, 170 L.Ed.2d 1030 (2008) (quoting § 3729(a)(2)).
>
> Finally, the defendant's false statement or record must have been material to the government's decision to make the payment sought in the defendant's claim. United States ex rel. A+ Homecare, Inc. v. Medshares Management Group, Inc., 400 F.3d 428, 443 (6th Cir. 2005).

501 F.3d at 505 (emphasis added).

The Sixth Circuit further recognized that under Bledsoe II, when a relator alleges a "complex and far-reaching fraudulent scheme to induce the government into making payments," (as SNAPP does here), the relator's complaint must "include specific

9

examples of the defendant's claims for payment from the federal government." Id. at 506 (citing Bledsoe II at 510). "In order for a relator to proceed to discovery on a fraudulent scheme, the claims that are pled with specificity must be 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." Id. (citing Bledsoe at 510-11). In other words, while the relator may not have to plead each and every "claim," it is required to plead specific examples of the "claims" for payment which form the basis for the violation of the FCA.

B.

The rub of this case has been, and remains, whether SNAPP has identified an actual "claim" under the FCA. As the Court has stated previously, a "claim" under the FCA is a "request for payment." See U.S. ex rel. Clausen v. Laboratory Corp. of America, Inc., 290 F.3d 1301, 1311 (11th Cir. 2002). The FCA defines a "claim" as:

> any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such ... request[ ] or demand[ ]."

31 U.S.C. § 3729(c).

In affirming the dismissal of the FAC, the court of appeals agreed that SNAPP failed to identify a claim:

> Despite the requirement that Relator must provide specific examples of claims submitted to the government as part of Ford's alleged fraudulent scheme, Relator does not provide a single example of a specific claim made by Ford. Instead, Relator merely alleges that "[f]rom 1991 through at least 2001, Ford was awarded contracts on an annual basis by the General Services Administration." (J.A. 240) Although Relator also provides an estimate of the approximate value of these contracts during the years 1991-2000, Realtor does not identify any individual representative claim for payment made by Ford to the federal government

10

during this time period. Accordingly, we hold that Relator has not complied with Bledsoe II's mandate that " '[i]n order for a relator to proceed to discovery on a fraudulent scheme,' it must pled with specificity 'characteristic example[s]' that are 'illustrative of [the] class' of all claims covered by the fraudulent scheme." 501 F.3d at 510-11; see also Sanderson, 447 F.3d at 877 ("Rule 9(b) 'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply ... that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.' " (quoting Clausen, 290 F.3d at 1310)).

U.S ex rel. SNAPP, 532 F.3d at 506.

C.

1.

SNAPP first says that SNAPP says that Sixth Circuit has "found" that the SAC pleads a "claim" as the second element of a section (a)(2) claim. In support, SNAPP cites the following footnote from Judge Clay's opinion:

> Indeed, in contrast to the dissent's contention, the new details included in the Second Amended Complaint include several examples of false claims. Similar to Relator's First Amended Complaint, the Second Amended Complaint identifies specific false statements made by Ford, thereby fulfilling one of the elements of a false claim. See Augustine, 289 F.3d at 413. Unlike the First Amended Complaint, however, the Second Amended Complaint also identifies numerous claims for payment Ford submitted to the federal government-another necessary element of a false claim. Marlar, 525 F.3d at 447. For example, in ¶ 45 of the Second Amendment Complaint, Relator alleges that the federal government paid Ford's claims for payment pursuant to "Ford Contract Nos. 10048, 10099, 10147, 10152, 10162, 10165, 95021, and 95042," and these payments were in the "respective amounts of $28,778,143.00, $12,181,678.00, $3,132,114.00, $31,556.00, $8,960,822.00, $32,409,513.52, $11,116,100.00, $16,319,424.00 and $168,397,635.00." (J.A. 382) Moreover, the Second Amended Complaint also alleges "[i]n response to Ford's claims for payment, the GSA paid Ford money under each contract that it would not have paid Ford had it been aware that the Subcontract Plans and SF-295 Forms submitted by Ford were false." (J.A. 384) This allegation complies with Rule 9(b)'s requirement that Relator plead with particularity that Ford's alleged false statement or record was material to the government's decision to make the payment requested by Ford. A+ Homecare, Inc., 400 F.3d at 443. As we have already explained in Part I of this opinion, Rule 9(b) does not require a relator to plead any additional elements of a

11

false claim with particularity.

Id. at 508 n. 8.

SNAPP grossly overstates the significance of this footnote. This footnote was not adopted by a majority of the Court. In his concurring opinion, Judge Suhrheinrich stated that he "concur[ed] in Judge Clay's opinion, except to the extent footnote 8 suggests that the Second Amended Complaint, as drafted, complies with Fed. R. Civ. P. 9(b)." Id. at 510-11 (Suhrheinrich, J., concurring) (emphasis added). Therefore, the footnote does not represent a finding by the Sixth Circuit that SNAPP has plead a claim for payment. Moreover, Judge Cook dissented from Judge Clay's opinion and concluded that the SAC failed to identify a single claim as required by Sixth Circuit precedent, including Bledsoe. Notably, Judge Cook pointed out that "[i]n his footnote 8, Judge Clay highlights specific contracts that the plaintiffs allege the government awarded to Ford as a result of Ford's fraud and the dollar value attached to those contracts. But a contract is not a claim." Id. at 511 n.1 (Cook, J., dissenting). Thus, the Court is free to again conclude that the SAC fails to plead a "claim" as required under § 3762(a)(2).

In reviewing the SAC for the second time, the Court continues to find that it fails to plead a "claim" in light of Bledsoe II and other Sixth Circuit precedent. As noted above, SNAPP must plead at least one claim which is characteristic of the type of claims Ford allegedly submitted to the government for payment. Nothing in Bledsoe II makes a "listing" of contracts awarded to Ford, the value of the contracts, and the number of vehicles awarded to Ford the same as a "request or demand, whether under a contract or otherwise, for payment." See 31 U.S.C. § 3729.

In footnote 8, Judge Clay cited paragraph 45 of the SAC as support for the assertion that SNAPP had plead a claim for payment under the FCA. Paragraph 45 provides:

> 45. In 1994, because of (1) Ford's status as a Prime Contractor, (2)Subcontract Plans (Ex. 2) that Ford submitted to the GSA, and (3) the GSA's mistaken belief that Ford was furthering the aims of the Small Business Act and in compliance with (or indirectly with) those laws and regulations material to the GSA's contracts with Ford, the GSA awarded Ford Contract Nos. 10048, 10060, 10099, 10147, 10152, 10162, 10165, 95021, and 95042, resulting in payments by the GSA to Ford in the respective amounts of $28,778,143.00, $12,181,678.00, $3,132,114.00, $31,556.00, $8,960,822.00, $32,409,513.52, $11,116,100.00, $16,319,424.00 and $168,397,635.00. (Ex. 3, at 3).

As the Court reads this paragraph, it does not "identify numerous claims for payment Ford submitted to the federal government," but rather shows that Ford had certain contracts with the government for the purchase of vehicles for which Ford was paid. As the Court previously held, a contract is not a "claim for payment." The only allegation with respect to Ford submitting a "claim for payment," is found in paragraph 51 of the SAC which simply alleges that "Ford submitted claims to the GSA for payment under each contract." Such a generalized, conclusionary statement satisfies neither the pleading requirements of Fed. R. Civ. P. 9(b) nor the requirement of Bledsoe II regarding pleading a fraudulent scheme. Indeed, the Sixth Circuit dismissed the complaint in Bledsoe II because the relator simply made general claims that the defendants submitted numerous bills to Medicare and Medicaid that did not qualify for payment and did not allege "any incidents of improper billing that [were] plead with particularity." Bledsoe II, 501 F.3d at 512.

At the hearing, counsel for SNAPP said that Ford likely possessed the

documents which evidenced the claim for payment and that discovery would reveal the same. Counsel for SNAPP also referred the Court to footnote 12 of the Sixth Circuit's opinion in Bledsoe II where it stated in part that

> We do not intend to foreclose the possibility of a court relaxing this rule in circumstances where a relator demonstrates that he cannot allege the specifics of actual false claims that in all likelihood exist, and the reason that the relator cannot produce such allegations is not attributable to the conduct of the relator.

Bledsoe II, 501 F.3d 493, 504, n. 12.

The problem with SNAPP's argument is two fold. First, SNAPP cannot say that discovery is needed in order to plead an element of a violation of § 3729(a)(2). The law is clear that SNAPP must plead every element before discovery in order to make out a violation. This included the pleading of a claim for payment. Second, the Sixth Circuit specifically declined to express an opinion "as to the contours or existence of any such exception to the general rule that an allegation of an actual false claim is a necessary element of a FCA violation." Id. The Court declines to find any such exception applicable here.

The "listing" of sixty five contracts between Ford and the government did not then and does not now provide this Court with any evidence as to even a single specific claim for payment made by Ford to the government, much less that payments were made to Ford because of its Prime Contractor status or as a result of its submissions of allegedly fraudulent Minority Subcontracting Plans as SNAPP is required to do to state a claim under the FCA. In other words, there is a disconnect between the contracts SNAPP says Ford was awarded and the documents which SNAPP says contain the fraudulent statements regarding the level of Ford's business with small and minority-

14

owned businesses , i.e. Ford Minority Subcontracting Plans and Summary Subcontract Report , SF 295, and the submission of a claim for payment by Ford.  Moreover, the listing does not describe the information included in it as being funds actually paid by the government to Ford, but rather, only as the "value of the contract."  In short, the contracts SNAPP relies on are not the specific or characteristic examples of Ford's claims for payment which are required to be plead under Bledsoe II.

2.

SNAPP also says that when alleging a violation of § 3729(a)(2), it need not identify a specific false claim, but rather that the existence of a claim can be "inferred" under § 3729(a)(2) because the "context" of section (a)(2) is different from that of section (a)(1).  SNAPP says that all that is required under section (a)(2) is to plead that defendant "must have" submitted a request for payment.  This argument lacks merit. Neither Bledsoe II nor U.S. ex. rel SNAPP relieves SNAPP of its obligation to plead a specific "claim" under § 3729(a)(2). "The False Claims Act imposes liability on a person who 'knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government.'"  U.S. ex. rel SNAPP, 532 F.3d. at 504, citing 31 U.S.C. § 3729(a)(2).

As noted above, section (a)(2) contains four elements.  The allegedly "false record or statement" referenced in section (a)(2) is a separate and distinct requirement from the "fraudulent claim" that gets paid.  This separateness is confirmed by U.S. ex. rel SNAPP, which identified these as distinct "elements."  Sections (a)(1) and (a)(2) define "claim" the same way, as "any request or demand, whether under a contract or otherwise, for money or property."  For section (a)(2), a claim that is paid using a false

15

statement or record is sufficient to establish liability, but a claim itself must be plead. Indeed, SNAPP's argument was rejected by the Sixth Circuit when it clearly stated that "Rule 9(b) 'does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply . . . that claims requesting illegal payments <u>must have</u> been submitted, were likely submitted or should have been submitted to the Government.'" <u>U.S. ex rel. SNAPP</u>, 532 F.3d at 506 (quoting <u>Sanderson</u>, 447 F.3d at 877 in turn quoting <u>Clausen</u>, 290 F.3d at 1310) (emphasis added).

The requirement that a qui tam plaintiff plead the existence of actual claim for payment is supported by the Supreme Court's holing in <u>Sanders</u> where the Supreme Court stated that a qui tam plaintiff may only prevail upon a showing that the defendant made a false statement with <u>the purpose of</u> "getting a false or fraudulent claim 'paid or approved by the Government.' " 128 S.Ct. at 2128, 2008 WL 2329722, at *5 (quoting § 3729(a)(2)) (emphasis added).

3.

Finally, SNAPP relies on a case from the Court of Appeals for the District of Columbia Circuit, <u>U.S. ex rel. Schwedt v. Planning Research Corp.</u>, 59 F.3d 196 (D.C. 1995), to argue that Ford's Summary Subcontracting Reports are "claims" under § 3762(a)(2). In <u>Schwedt</u>, the court held that "false progress reports about the status and success of the systems, inducing the government to pay for various components of the project that it would not otherwise have accepted . . . constitute false claims under the Act." <u>Schwedt</u>, 59 F.3d at 197. The progress reports were directly tied to the parties' contracts in which the defendant was to provide computer software to the government at set time periods. In other words, the progress reports were integral to the shipment

16

of software.

  To the extent that <u>Schwedt</u> is precential, it is factually distinguishable.  In <u>Schwedt</u>, the defendant was said to have submitted false progress reports to the government to induce the government to pay for incomplete software.  The false progress reports were linked to the requests for payment.  Here, the situation is far more attenuated.  At best SNAPP has merely alleged that Ford submitted fraudulent Summary Subcontracting Reports and Subcontracting Plans which overstated the amount of its qualified small business and minority contracting.  SNAPP has not identified any claims, much less fraudulent claims, and does not assert, as did the relator in <u>Schwedt</u>, that the delivery of the product (vehicles) by Ford to the government was tied to the alleged fraudulent statements in the progress reports.  There is no nexus here.

V.  Conclusion

  In sum, nothing has changed in the remand.  Even considering the pleading requirements for a complex scheme set forth in <u>Bledsoe II</u>, SNAPP's SAC still fails to satisfy a most basic pleading requirement for a FCA under § 3729(a)(2) - the identification of a "claim for payment" that Ford submitted to the government.

  There is no injustice in denying SNAPP leave to file the SAC.  As the Court stated in denying SNAPP's motion for leave to amend, "[b]ased on the history of this case explained in the Court's prior orders, SNAPP has had more than ample time to shape its FCA claim against Ford.  It has simply been unable to frame its allegations within the confines of the FCA."  Order Denying Snapp's Motion to File Second Amended Complaint or in the Alternative for Leave to Alter or Amend Judgment, filed

March 17, 2007 at p. 3.  This case is DISMISSED.

    SO ORDERED.

                                      s/Avern Cohn
                                      AVERN COHN
                                      UNITED STATES DISTRICT JUDGE

Dated: April 7, 2009

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, April 7, 2009, by electronic and/or ordinary mail.

                                      s/Julie Owens
                                      Case Manager, (313) 234-5160